John W. Kelley and Bette C. Kelley v. Commissioner.
Kelley v. Commissioner
Docket No. 63649.
United States Tax Court
T.C. Memo 1959-63; 1959 Tax Ct. Memo LEXIS 185; 18 T.C.M. (CCH) 329; T.C.M. (RIA) 59063; March 31, 1959
John W. Bonner, Esq., 109 South 3rd Street, Las Vegas, Nev., for the petitioners. Jack E. Roberts, Esq., for the respondent. RAUM
Memorandum Opinion RAUM, Judge: The respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax,
I.R.C. 1939
Sec. 294
Sec. 294(d)
Year
Deficiency
(d)(2)
(1)(A)
1952
$1,813.58
$103.95
$252.61
1953
2,922.70
170.50
420.84
1954
1,159.38
63.08
126.32
The principal issue is whether certain parcels of real property sold by the petitioners during the years 1952, 1953 and 1954 were held by them primarily for sale to customers in the ordinary course of their trade or business. Other issues, involving the petitioners' liability for self-employment tax and additions to tax for failure to file *186 timely declarations of estimated tax and for substantial underestimate of declarations of estimated tax, have not been separately briefed, and the parties have presented the case in such manner that the proper disposition of these issues has been treated as following automatically from the disposition of the principal issue. All of the facts have been stipulated and the stipulation is adopted as our findings of fact. Petitioners, residents of Winchester, Nevada, a suburb of Las Vegas, Nevada, filed joint income tax returns for the years 1952, 1953 and 1954 with the director of internal revenue, Reno, Nevada. Petitioners came to Nevada in 1947 from the State of Texas, where they had been engaged in ranching activities for many years, with the intention of buying a cattle ranch in Elko County, Nevada. Enroute they passed through Las Vegas, liked it, and decided to settle there. They owned seven horses at that time. In January, 1948, they purchased 160 acres of land, including improvements, in Paradise Valley, which is approximately six miles from Las Vegas, and have resided on this land ever since. At the time of the purchase, they intended to operate a ranch on the property. *187 They had no intention at that time of entering the real estate business. Late in 1948 petitioners began to experience some financial difficulty in the operation of the ranch which prompted them to seek employment and other sources of income. They obtained an ice skating concession at Mt. Charleston, Nevada, which they operated until approximately April 30, 1949. This venture was unsuccessful and they sustained an operating loss. In order to meet their obligations, they decided to sell certain portions of their real property, and during 1949 made the following sales: Date
Property
Sales Price
May 19
40 acres
$5,000.00
August 8
40 acres
5,000.00
November 12
.95 acre
300.00
December 7
7 acres
1,762.50 The gain on these sales was reported on petitioners' income tax return for 1949 as capital gain. This treatment was allowed by the Commissioner. During the years 1949 and 1950 and part of 1951 John W. Kelley was employed by the United States Post Office Department and during part of 1951 by the Nevada Armored Transport. During these years his wife received some compensation for part-time employment. Petitioners sold their original residence on their *188 Paradise Valley property, and in 1951 constructed a new residence on another portion of the property. In 1952 they subdivided approximately 56 acres of their land into 96 building lots known as the Vista Del Sol Subdivision. The cost basis of this acreage was $4,200 prior to the subdivision. Petitioners made expenditures to improve the subdivided property, the estimated cost of which was as follows: Survey and Engineering
$ 1,500
Roads (grading and surfacing)
15,000
Wells
6,000
Waterlines
13,900
Pumps
6,500
Installation
500
Storage Tanks
3,600
Installation
800
Power
6,000
Total cost of improvements
$53,800 The pro rata adjusted basis of each of the 96 lots was $604.17. During the years 1952, 1953 and 1954 the petitioners sold some of these lots. The number of lots sold, the total sales price, and the net gain realized by petitioners from such sales in each of these years were as follows: Total
Lots
Sales
Year
Sold
Price
Net Gain
1952
9
$21,250
$12,955.32
1953
15
30,250
17,553.81
1954
5
13,454
8,591.55
Petitioners have no license to act as real estate brokers. The services of a real estate broker were *189 engaged and through him the lots were advertised for sale. Commissions were paid on all sales made by the broker. Petitioners subsequently became dissatisfied with the services of the broker and continued the sales themselves. All conditional sales contracts and deeds of trust were handled by them. Petitioners reinvested a substantial percentage of their profits in the subdivision for further development rather than purchasing additional property. No deductions for trade or business expenses were claimed on petitioners' income tax returns for the years 1952, 1953 and 1954. Petitioners realized no income from any employment, trade, or busines during the years 1952, 1953 and 1954 except the gain from the sale of lots and interest received on the conditional sales contracts and deeds of trust arising from the sale of the lots. Petitioners filed no declaration of estimated tax nor were any payments made on their estimated tax liability for the years 1952, 1953 and 1954. The question whether a sale of real estate constitutes a sale of a capital asset or a sale of property held primarily for sale to customers in the ordinary course of a trade or business is essentially one of fact. *190 It has been considered by this and other courts in a large number of cases, and certain factors have been recognized as helpful guides in reaching the correct result. Among them are the purposes for which the property was acquired, frequency and continuity of sales as opposed to casual sales; and the activity of the seller or those acting for him in making improvements on the property and advertising it to attract customers. Cf. Pool v. Commissioner, 251 Fed. (2d) 233, 235 (C.A. 9), certiorari denied, 356 U.S. 938; Stockton Harbor Industrial Co. v. Commissioner, 216 Fed. (2d) 638, 650; Palos Verdes Corp. v. United States, 201 Fed. (2d) 256, 258 (C.A. 9); Home Co., Inc. v. Commissioner, 212 Fed. (2d) 637, 639 (C.A. 10). In support of their contention that the gain realized from the sales of building lots during the years 1952, 1953 and 1954 constituted capital gain and not ordinary income, the petitioners urge that the entire sales program was exclusively to liquidate investment property; that in order to obtain customers for 56 acres of that property they subdivided it into 96 building lots; that no substantial improvements *191 were made on the subdivided acreage; that they had no real estate office or real estate license; that sales were made primarily through a real estate broker acting as their agent; and that the sales were not frequent and continuous. In Home Co., Inc. v. Commissioner, supra, the Court of Appeals for the Tenth Circuit, at page 641, said: "One may, of course, liquidate a capital asset. To do so it is necessary to sell. The sale may be conducted in the most advantageous manner to the seller and he will not lose the benefits of the capital gain provision of the statute, unless he enters the real estate business and carries on the sale in the manner in which such a business is conducted. In that event, the liquidation constitutes a business and a sale in the ordinary course of such a business and the preferred tax status is lost." The manner in which petitioners conducted the alleged liquidation during the taxable years convinces us that they became engaged in the real estate business and made sales of their property in the ordinary course of that business. In 1952 they subdivided 56 acres of land, originally acquired for ranching purposes, into 96 building lots. They *192 then expended approximately $53,000 for improvements. The improvements included hard surface roads, waterlines, wells, pumps, storage tanks, and electric power lines. During the years 1952, 1953 and 1954 they sold 29 lots for $65,954, and realized a net gain of $39,100.68. The sales of an undisclosed number of these lots were made by a real estate broker employed by petitioners, and the remaining sales were made by petitioners without any outside assistance. During these years profit realized on sales of lots and interest received on conditional sales contracts were the sole sources of their income. It is apparent that the 56 acres were subdivided into building lots and improved in order to increase the profit from the sale of this acreage. The improvements made by petitioners were substantial and the sales during the taxable years were frequent and continuous rather than isolated or casual. Subdividing property into building lots, making substantial improvements thereon to enhance their value, offering them for sale at a price substantially in excess of cost of land and improvements, and making frequent and continuous sales are activities engaged in by persons in the trade or business *193 of selling real estate, and not by persons who are interested only in the liquidation of an asset. Cf. Frieda E. J. Farley, 7 T.C. 198, 203-204; George W. Longfellow, 31 T.C. 11. And the business nature of these activities is not affected by the fact that some of them were performed through a broker or agent, rather than directly by the persons owning the property. Gamble v. Commissioner, 242 Fed. (2d) 586, 592 (C.A. 5). On the basis of the entire record we conclude, and find as a fact, that the building lots sold by petitioners during the taxable years were held by them primarily for sale to customers in the ordinary course of trade or business. Petitioners contend that they are entitled to have the profit realized on the sales of lots made during 1954 treated as capital gain under the provisions of Section 1237, Internal Revenue Code of 1954. This section which is applicable to years ending after December 31, 1953, provides, in so far as here material, that any lot or parcel which is part of a tract of real property in the hands of a taxpayer shall not be deemed to be held primarily for sale to customers in the ordinary *194 course of trade or business at the time of sale solely because of the taxpayer's having subdivided such tract for purposes of sale or because of any activity incident to such subdivision or sale if three conditions are met. One of these conditions is that "No substantial improvement that substantially enhances the value of the lot or parcel sold is made by the taxpayer on such tract while held by the taxpayer. * * *" Section 1.1237-1(c)(4) of the Income Tax Regulations issued under the Internal Revenue Code of 1954 provides in part as follows: "When an improvement is substantial. - To prevent the application of section 1237, the improvement itself must be substantial in character. Among the improvements considered substantial are shopping centers, other commercial or residential buildings, and the installation of hard surface roads or utilities such as sewers, water, gas, or electric lines. * * *" See Senate Finance Committee Report No. 1622, 83rd Cong., 2d Sess., p. 442. As already noted, petitioners made improvements of $53,800 on the 56-acre tract which had a cost basis of $4,200. These improvements included surfaced roads, electric power lines and *195 water lines, and wells, pumps and storage tanks. They substantially enhanced the value of the lots sold. In the circumstances Section 1237 had no application and does not require any change in the conclusion we have reached that the lots sold by petitioners were held primarily for sale to customers in the ordinary course of trade or business. Decision will be entered for the respondent.